COMMONWEALTH *v.* SAMUEL PRYOR AND JOEL T. THORN.

[Charged, on the affirmation of James T. Leet and Smith Laws, with a conspiracy to cheat aad defraud them out of $500 each respectively.]

AND now, December 25, 1842, came the parties— *Hawley & Phillips* for commonwealth, *Hopkins* for Pryor, and *Haley* for Thorn.

The responsibility of deciding on the facts presented in this case, has been thrown upon me by the counsel for the commonwealth and for the defendants, without argument. This is the more to be regretted, as from their high professional character, it is beyond question that this responsibility would have been more intelligently discharged, had I enjoyed the benefit of their several views in regard to the facts adduced in support of this charge.

It appears from the testimony of James T. Leet, who is a disinterested witness, that in November, 1842, Pryor called on him, and asked if he (Leet) and Smith Law, in whose business house witness was employed, wanted "to trade in bonds and mortgages?" to which witness replied, "yes, if they were good." Pryor stated they were, and offered two from Joel T. Thorn to Walter Ross, which are offered in evidence. Mr. Leet then employed Mr. Pryor as his and Mr. Law's agent, to make searches and other inquiries, which are part of the business of conveyancers. Mr. Pryor consented to

act as the conveyancer of Messrs. Leet and Law, and for which services he was paid by them. He, Pryor, gave information, which was believed by his principals to be such, as resulted from his professional inquiries, as their paid agent, that Thorn had property, and that against all his property, naming it, there was then but $3900 held. The property which Pryor represented Thorn to own, was worth very much more than these incumbrances. To substantiate these facts, as reported by Pryor, Thorn was produced, and they together called on Leet and Law, and half a dozen times "assured him that there then existed no other liens against this property." Upon these representations, Leet and Law paid $1000, and received both a special and a general judgment to cover all the property of Thorn.

For the $1000 thus paid by James T. Leet and Smith Law, to Thorn, they each received a mortgage for $500, of which mortgage Joel T. Thorn was the assignor, and Walter Ross, his father-in-law, the assignee, and which said mortgages the said Walter Ross then assigned to Leet and Law on the 10th day of December, 1842. From the evidence of Walter Ross, who was originally joined with the present defendants in this charge, but who was subsequently discharged, and called by the commonwealth as a witness, it appears, that for neither of the two mortgages thus assigned by him to Leet and Law, did he ever receive one cent of consideration, nor did one cent of consideration pass upon which the original mortgages were based. That he knew of no other transaction of any like kind between himself and Thorn; that Thorn did not owe him any sum of money at this time.

It is also in evidence that on the 27th day of February, 1843, Joel T. Thorn filed his petition for the benefit of the bankrupt law, and in his said petition he does not return the said Leet and Law as among his creditors; and it farther appears that the said mortgage and judgment entered on the bonds accompanying them are valueless.   It is farther in evidence that during the years 1841 and 1842, there existed against the property of Thorn, which Pryor represented to be clear of all incumbrances, except the $3900, judgments and other liens amounting to nearly $20,000.   This is a concise statement of the facts, upon which is founded a charge of conspiracy, to cheat and defraud the said James T. Leet and Smith Law.

There can be but little doubt that fraud existed in the operations between these parties.

If James T. Leet be a credible witness, and his character as such has not been attempted to be impeached, we must regard his testimony as veritable.   He says that Samuel Pryor volunteered the sale of the mortgages in question—that on his representation, as to the value of these mortgages, he was employed as the agent of both Mr. Leet and Mr. Law, in which capacity, he reiterated the opinion he had expressed, as to the worth of these securities, and stated that Thorn's property was clear of incumbrance, save $3900.   He produced no searches, which it was his duty to have both made and exhibited, but to support his assertions, he brings with him Thorn, for whose benefit, the money to be obtained by the sale of the mortgages, was to accrue. They both assure Messrs. Leet and Law, that the property is clear of all liens save $3900.   The falsity of

their statement must have been known to Pryor at the time he made it, for it appears by evidence, that on the 26th day of October, 1842, hardly a month before these assurances were given by Prior, that Joel T. Thorn executed an indenture of mortgage to Lewis Peterson, William H. Schreiner and Samuel Pryor, as trustees of one Harriet Aitken, conditioned for the payment of $1000, on a property in Schuylkill Eighth near Pine street, upon which property was another and prior lien of $1650, which last lien, Pryor stated was all, except that of the Franklin Fire Co., on the Schuylkill Eighth and Vine street houses, the incumbrances against the property of Thorn. It is impossible to attribute this to any mistake or error of judgment, or even negligence, for if Pryor had acted as it was his duty to have done, and made regular searches of the proper records, in order to protect the interests entrusted to his skill and care, he would have found, that at the very time he made the assertion that $3900 was all the indebtedness for which Thorn's property was liable, that he, Pryor, had a lien for a trust estate of $1000, and that some 12 or $15,000 besides, were entered against it.

That Thorn knew of these incumbrances cannot be doubted, for the fictitious mortgages given by him to his father-in-law, which, in themselves, amounted to several thousand dollars, together with those apparently fairly given, and duly entered in the proper offices, amounted together to far more than he represented as due to Messrs. Leet and Law.

The object Thorn had in making these representations is evident, for he, in about two months thereafter, applied for the benefit of the bankrupt law; and, in his appli-

cation, he made no return of these mortgages, notwithstanding the affirmation attached to the said petition. The factitious mortgages given to Ross, and his assigning them, when no consideratiens passed, although he, Ross, signed and sealed a falsehood, by the request and at the instance of Thorn, both go to show that Thorn was willing and capable from his experience and practice, to deceive.

That Pryor agreed to aid. Thorn in his deception, is plain, for the facts show it. How far they agreed together and conspired to cheat Messrs. Leet and Law, by these false representations, under the guise of an honesty assumed to be both individual and professional, is to be decided by a jury of their country. To say that Pryor acted only as a conveyancer, as a professional agent of Leet and Law, and therefore not to be held answerable for the frauds of Thorn, is to give an immunity to professional men, which no correct-minded man would desire to sanction. It is not the policy of our laws to cover with any such professional cloak, acts which tend to injure innocent persons, destroy fair dealing and bring reproach upon the impartiality of justice. I never will consent to give to any man, whose acts will so illy bear investigation, as those of Pryor in this case, the protection which he may claim as arising out of his professional character.

The penalties of the law are strictly visited upon the less cunning or crafty violators of its provisions or enactments, and I can never tolerate the idea, that such penalties should not be as impartially imposed on men, when detected, whose intelligence or particular avocations, are used to avoid such detection.

It is therefore vain to argue, that Pryor is exempted from suspicion because he acted in his professional character as a conveyancer. That is to my mind a strong fact against him. If he was a conveyancer, as he pretended to be, and if he understood the obligations of a business he professed to follow—he was more criminal than one not of his calling, in using that character to aid in his deceptions.

Whenever my action is required, I feel bound to say that in no case, will eithor the intelligence, or professions or respectability of any man, be regarded as cause, of themselves, for staying, or diverting, or weakening the course of equal and exact justice.

The charge laid in this case is conspiracy. It is one easily made, and in some instances may be used to inculpate innocent persons. It is regarded always with a jealous eye, and should be discouraged as a general rule. There are however cases, which are violations of law, and which can only be reached by charging conspiracy—a wise discrimination must be used in applying this remedy to unlawful acts.

In a recent case I have had occasion to reflect on this subject, and the views then expressed have been confirmed by farther consideration. After speaking of the difficulty of awarding punishment for acts not of themselves indictable under the statute law, or coming within the reach of common law crimes, I say: "Here no doubt was the first source of difficulty in the administration of the laws, which led to the common law crime of conspiracy. In both the supposed cases, the 'participis criminis' could be reached, and punished too, as severely as the most guilty, under the charge of

'conspiracy.' Most fortunate it is that in such cases a remedy is provided, but because there is a mode of punishment such as this, for certain cases, it is not therefore to be used on all occasions. Let it be the 'medicine, not the daily bread of the law.' It may be fairly concluded that the real motive for the creation of conspiracy in the criminal code, was to mete out some punishment for unsuccessful attempts to commit a more serious crime, or to punish the agreement or combination to effect such purpose. Thus conspiracy has been classed among the offences against the right of persons. If this view be correct, conspiracy is the mode of punishing these parties, in a misdemeanor as conspirators, who, in cases of felony, would bear relation to such felony, either as principals or accessories. In other words, conspiracy is a general term which was intended to include accessories in misdemeanors; or carrying the classification of principal and accessories which existed as related to felonies down to misdemeanors, join all under the charge of a conspiracy.

"If this was the rule of law in regard to conspiracies, it would be easy to determine what constituted the crime. No person could then be liable to the charge of conspiracy, unless their relation to the offence which was the object of the conspiracy, was such, as had the offence been a felony, it would make them either principals or accessories. Or their participation in the illegal combination or confederacy, placed them quo ad such combination or illegal agreement or confederacy in the same relation thereto, as if instead of it being a combination, it had been a felony and would have made them principals or accessories."

Within this rule, I consider the present case will come. If the acts and representations of Thorn had resulted in a larceny or forgery, Pryor would have been equally guilty.

This case presents another example of the prejudicial effects of special legislation. It may be partial, unwise, defective and transitory—it may destroy the rights, and impair the security, of the citizen—it may be partizan and impolitic—it may be at variance with fundamental principles of social organization—it may introduce uncertainty and distrust into the business affairs of the people, and still accomplish the end of its creation; so unlike is it to the common law. The latter is born of wisdom and experience, nursed by practice, strengthened by the nutriment of universal confidence, admired for its justice, respected for its impartiality; and its importance most sensibly felt when its character is impaired. The bankrupt law has been a misfortune rather than a benefit to the country. Aside from the question of its unconstitutionality, which it is not my business to inquire into, it has been the source of both evil and crime. Its ostensible object was to relieve honest debtors; its practical operation has been to make, in many cases, visionary and imprudent speculators, criminals. It was the climactic in a system of legislation, which put in the power of a few, the price of the labour, and the value of the property, gained and accumulated by honest industry; which made a promise or contract to pay money, equivalent to payment, which made a representation a reality; of a system, which fostered speculations, and contracts, and indebtedness, the results of capital, without its substance—which encouraged unhealthy action

6

in commercial and monetary affairs, which spread over the length and breadth of the land, and ended almost in general ruin—of a system, founded on such false basis, prcductive of such serious evils, it became necessary to add a principle of repudiation, which was only the result to be expected from its operation.

To establish by law the precedent, that contracts between man and man could be nullified, and entire exemption obtained from their conditions, at the will of the party; and this too, by crime and fraud, was the inevitable consequence, the appropriate accompaniment, of that legislation, which gave to the nation the advantages of money and credit, without its presence or reality.

The crimes which have followed in the train of this individual repudiation of formal indebtedness, called the bankrupt law, will have the effect, like the evils of its twin sister, to strike at the foundation of individual, as well as national character. The latter nursed and fostered frauds, the former has cradled crimes. A disease in morals, is like all other maladies, it may be endemic and epidemic, and as individuals constitute communities, and communities nations, if you expect an honest nation, you must find upright people.

The present case is an isolated instance, of the evils of unreal credit, and its consequences; and a repudiation of contracts, engagements and stipulations legally created, together with some of the crimes which have resulted from both. We may expect to hear of many such examples. It is bad enough that they exist, but when the hand of the criminal law is laid upon their authors, it becomes a far more sorrowful consideration

to find, that the experience gained in avoiding the requirements of the civil law, enables them to escape the punishments of the other—and superadded to all the other mischiefs thus engendered, by far the greatest, is the inequality produced in the administration of justice.

Entertaining these views, arising as they do, from the consideration of the present case as presented for determination, I feel it my duty to hold the defendants over to answer for the charge preferred against them—and my desire is, that they may enjoy the benefits of a fair trial, and the community be taught, that violations of law are most inexcusable in those, whose character, intelligence, and advantages, must have informed their minds and consciences, of the wrong they were committing.

Defendants held in $600 each, to appear and answer at the next term of the court of quarter sessions of the peace for the city and county of Philadelphia.